IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Harrisonburg Division

| | | |
|---|---|---|
| STEPHANIE B.,[1] | ) | |
| Plaintiff, | ) | Civil Action No. 5:20-cv-00060 |
| | ) | |
| v. | ) | MEMORANDUM OPINION |
| | ) | |
| KILOLO KIJAKAZI, | ) | By:   Joel C. Hoppe |
| Acting Commissioner of Social Security, | ) | United States Magistrate Judge |
| Defendant.[2] | ) | |

Plaintiff Stephanie B. asks this Court to review the Commissioner of Social Security's

final decision denying her application for disability insurance benefits ("DIB") under Title II of

the Social Security Act (the "Act"), 42 U.S.C. §§ 401–434. The case is before me by the parties'

consent under 28 U.S.C. § 636(c). ECF No. 6. Having considered the administrative record, the

parties' briefs and oral arguments, and the applicable law, I find that the Commissioner's final

decision is supported by substantial evidence and must be affirmed.

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final

decision that a person is not entitled to disability benefits. 42 U.S.C. § 405(g); *see also Hines v.*

*Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not

"reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for

that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, a court

reviewing the merits of the Commissioner's final decision asks only whether the Administrative

Law Judge ("ALJ") applied the correct legal standards and whether substantial evidence supports

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

[2] Acting Commissioner Kijakazi is hereby substituted as the named defendant in this action. *See* 42 U.S.C. § 405(g); Fed. R. Civ. P. 25(d).

the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 98–100 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review considers the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *accord* 20 C.F.R. § 404.1505(a).[3] Social Security ALJs follow a five-step process to determine whether a claimant is disabled. The ALJ asks, in sequence, whether the claimant (1) is working; (2) has a severe impairment that satisfies the Act's duration requirement; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant

---

[3] Unless otherwise noted, citations to the Code of Federal Regulations refer to the version in effect on the date of the ALJ's written decision.

work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. § 404.1520(a)(4). The claimant bears the burden of proof through step four. *Lewis*, 858 F.3d at 861. At step five, the burden shifts to the agency to prove that the claimant is not disabled. *See id.*

## II. Procedural History

Stephanie applied for DIB in February 2018, *see* Administrative Record ("R.") 190–91, alleging disability because of diabetes, nerve damage, depression, and anxiety, R. 203. She alleged that she became disabled on August 1, 2017. R. 190. Stephanie was forty years old, or a "younger person" under the regulations, on her alleged onset date. R. 63; 20 C.F.R. § 404.1563(c). Disability Determination Services ("DDS"), the state agency, denied her claim initially in May 2018, R. 63–81, and upon reconsideration that August, R. 83–100. In December 2019, Stephanie appeared with counsel and testified at an administrative hearing before ALJ Clary Simmonds. R. 34–62. A vocational expert ("VE") also testified at this hearing. R. 56–61.

ALJ Simmonds issued an unfavorable decision on January 24, 2020. *See* R. 12–24. She found that Stephanie had not engaged in substantial gainful activity since August 1, 2017, her alleged onset date. R. 14. Stephanie had "severe" medically determinable impairments ("MDI") of cervical degenerative disc disease, major depressive disorder, generalized anxiety disorder, and alcohol use disorder. *Id.* Her obesity, hypertension, gastroenteritis, gastroesophageal reflux disease, asthma, and diabetes were "non-severe" MDIs. *Id.* None of Stephanie's severe impairments met or medically equaled a relevant Listing. R. 15–17 (citing 20 C.F.R. pt. 404, subpt. P, app. 1 §§ 1.02, 1.04, 11.14, 12.04, 12.06).

3

ALJ Simmonds then evaluated Stephanie's residual functional capacity ("RFC") and determined that she could perform "light"[4] work with additional limitations. R. 17. Specifically, Stephanie could lift, carry, push, and/or pull ten pounds frequently and twenty pounds occasionally; sit and stand/walk for up to six hours each during an eight-hour workday; frequently climb ramps/stairs, balance, and crawl; occasionally climb ladders/ropes/scaffolds; and frequently handle and reach bilaterally. *Id.* Further, she needed to avoid concentrated exposure to respiratory irritants and poorly ventilated areas, and she could perform "simple routine tasks in a nonpublic setting that [required] only occasional interaction with co-workers and frequent interaction with supervisors"; "maintain concentration, persistence, and pace in 2-hour increments"; "perform work that does not require a production rate pace or an hourly quota"; and remain on task 90% (or be off task for no more than 10%) of the workday." *Id.*

Based on this RFC finding and the VE's testimony, ALJ Simmonds found that Stephanie could not return to her past relevant work as a convenience store clerk, R. 22, but she could perform the requirements of certain "light" unskilled jobs existing in significant numbers in the national economy, including night office cleaner, night stock clerk, and non-government mail clerk, R. 23 (citing R. 56–60). She therefore found Stephanie "not disabled" from August 1, 2017, through January 24, 2020. R. 24. The Appeals Council declined to review that decision, R. 1–6, and this appeal followed.

### III. Discussion

---

[4] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b). A person who can meet these relatively modest lifting requirements can perform "[t]he full range of light work" only if he or she can also "stand or walk for up to six hours per workday or sit 'most of the time with some pushing and pulling of arm or leg controls.'" *Neal v. Astrue*, Civ. No. JKS-09-2316, 2010 WL 1759582, at *2 (D. Md. Apr. 29, 2010) (quoting 20 C.F.R. § 404.1567(b)); SSR 83-10, 1983 WL 31251, at *5–6 (Jan. 1, 1983).

Stephanie raises four arguments challenging the ALJ's decision. *See generally* Pl.'s Br. 2–3, ECF No. 15. She first argues the ALJ failed to give "considerable weight" to the opinions of Syed Rizvi, M.D., that Stephanie's "significant psychiatric symptoms would interfere" with her "being gainfully employed" and that the combination of her medications "would cause drowsiness" and "sedating effects" limiting her ability to drive safely. *Id.* at 2 (citing R. 21, 776). Next, she contends that the ALJ "failed to give considerable weight to the medical records of Sentara RMH Behavioral Health," which she argues support Dr. Rizvi's opinion because they document "her continuous anxious mood, depressive state, continued issues of insomnia and fatigue along with adjustments to her medications." *Id.* (citing R. 670–718, 851–1096). Stephanie then asserts that ALJ Simmonds should have "given greater consideration" to her medication side effects, noting that she testified those medications "affect[] her ability to stay awake" during the day, and that such testimony is consistent with Dr. Rizvi's opinion that her medications have "sedating effects." *Id.* at 2–3 (citing R. 49–50, 776). Next, she argues that the ALJ's references to her primary care provider's findings of "no acute distress" and "normal memory" as part of the ALJ's RFC assessment were in error because that provider was "not qualified to assess" Stephanie's "mental issues." *Id.* at 3 Lastly, during oral argument, Stephanie's counsel argued for the first time that the ALJ had not provided an adequate basis for her finding that Stephanie could "remain on task 90 percent (or be off task for no more than 10 percent) of the workday," R. 17. Stephanie's arguments are not persuasive.

A.    *Summary*

1.    *Relevant Medical Evidence*

In October 2017, Stephanie presented to the Sentara Luray Health Center, complaining of chronic right shoulder pain and anxiety and depression. R. 622. She did not have insurance at the

time and requested a "short supply" of Ambien to help her sleep until she got coverage back in December. R. 623. She used to take Seroquel for sleep, but she took it for only "a short time [because] it made her sleepy in the morning[s]." *Id.*; *see* R. 625 ("She took Seroquel [for] a week. She states that the 25 mg dose made her so sleepy she slept most of the day. She felt she was missing out on life by sleeping so much so she stopped the medicine.") (Aug. 5, 2016). She still took Cymbalta for chronic right shoulder pain, and she suggested that it was also "helping with anxiety and depression." R. 623 ("[I]f she misses a dose she feels more anxious."). She endorsed "flight of ideas and continue[d] to ponder over them," but she had "no intentions of harming herself or other[s]." *Id.* She also felt like she needed a "referral to psychiatry for [a] mood disorder." *Id.* (reporting "agitation, insomnia, nervous/anxious, sleep disturbance and depressed mood"). On exam, Stephanie endorsed tenderness in her right shoulder and was alert with "anxious" mood and "normal" mood/affect, behavior, thought content, and memory. R. 624. Stephanie's primary care provider, Nancy Brubaker, N.P., assessed chronic right shoulder pain and anxiety, continued Stephanie on Cymbalta, provided a "short supply of [A]mbien to use if [she was] not able to sleep," and referred her to psychiatry. R. 622.

On November 6, Stephanie was taken by a police officer to the emergency department at Shenandoah Memorial Hospital for suicidal ideation after a family member with concerns over her mental health contacted the police. R. 455–56, 460 ("Her aunt had called police after talking to pt on phone and became very fearful for patient."). Stephanie said that her husband had been talking with other women and that she had been feeling depressed and had difficulty sleeping. R. 456. She expressed that she "just want[ed] to go to sleep," and that she did not think she would have "actually" committed suicide. *Id.* She was tearful and anxious on exam. R. 457. The

attending physician diagnosed suicidal ideation, and he ordered a transfer to Winchester Medical Center ("WMC") the next day. R. 459.

Stephanie was voluntarily admitted to WMC on November 7, 2017. R. 419. Examination revealed anxiousness, restlessness, aged appearance, crying/emotional, depressed mood, dysphoric and limited/restricted affect, poor insight, and improving judgment. R. 417. Stephanie reported feeling embarrassed, ashamed, and hopeless, and she "want[ed] to give up." R. 413. She also said she had been unable to sleep, described her emotions as being "all over the place," and said her thoughts would sometimes "take over" and it was like someone screaming at her. *Id.* She could not "leave the living room because of her distress," and she "present[ed] as extremely anxious, tearful, afraid to go home." *Id.* Stephanie admitted to having suicidal thoughts and contemplating an intentional overdose after having seen text messages between her husband and another woman. *Id.* She said she sometimes drank "just to cope" and that her symptoms had been worsening over the past several months. *Id.*

Three days later, Stephanie was discharged at her "baseline level of functioning." R. 400. On exam, she described her mood as "better," and she exhibited mood-congruent and euthymic affect, logical thought process, no suicidal or homicidal ideation, and good insight and judgment. *Id.* Stephanie reported improvement in her mood during her stay with medications (Abilify, Cymbalta) and abstaining from alcohol, reported an improved relationship with her husband, and declined the option to remain in the hospital longer, expressing a desire to return home to her family. R. 397. Stephanie was diagnosed with major depressive disorder with psychotic features, alcohol use disorder, suicidal ideation, borderline traits, and possible panic disorder. R. 395.

In December 2017, Stephanie followed up with Dr. Rizvi regarding her anxiety, depression, and suicidal ideation. R. 570. She reported that she had experienced depressive

symptoms over the past year, but that they had become severe over the prior two to three months, and she reported low mood, poor sleep quality, insomnia, racing thoughts, irregular appetite, poor concentration, and "fleeting" suicidal ideation without intent or plan. R. 571. Stephanie said she found her hospital stay "really useful," she was doing "much better," and she was in the process of making lifestyle changes given her recent diagnoses of diabetes and hypertension. *Id.* Stephanie also described "vague" intermittent auditory hallucinations of voices singing to her and said she had experienced one the day she was admitted to the hospital, but had not had any recently. *Id.*; *see also* R. 574 ("Vague auditory hallucinations described, singing male and female voices, varying in severity and intensity, usually become more intrusive at the time of stress, can be suggestive or command in nature, not present in recent weeks."). On exam, Stephanie's behavior was normal with "fair" insight and judgment, she said her mood was "'anxious,'" she exhibited a "mood-incongruent" affect with smiling and laughing, and she had a circumstantial thought process, but "grossly intact" cognitive function. R. 574. Dr. Rizvi assessed severe single current episode of major depressive disorder, with psychotic features; generalized anxiety disorder; mixed obsessional thoughts and acts; and moderate alcohol use disorder, in early remission. R. 575. He increased her Cymbalta (duloxetine) to "target[] residual depressive and anxiety symptoms," continued her on Abilify (aripiprazole) for depression, and prescribed trazodone for insomnia and hydroxyzine (Atarax) as needed for "acute anxiety" events. *Id.*; *see* R. 395. He also encouraged Stephanie "to start psychotherapy with [a] Dr. Caldwell," and she agreed. R. 575.

Stephanie saw Dr. Rizvi again in March 2018. R. 599. She reported increased depression because of issues with her grandmother's health and noted that she recently spent a month in Illinois "trying to take care of her and found it really stressful." *Id.* ("She endorses worsening

depression, crying spells, . . . irritability, and at times worsening auditory hallucinations."). Stephanie had seen Dr. Caldwell for an "intake appointment," but she had not been able to follow-up while caring for her grandmother. *See id.* ("Patient was also not able to see her therapist Dr. Caldwell *except* for intake appointment because of this ongoing stressor." (emphasis added)). Stephanie said trazodone and hydroxyzine were "helpful with insomnia and anxiety[,] respectively." *Id.* She had not taken any Abilify since her previous visit because she forgot to call in a refill request. *Id.* On exam, Stephanie was pleasant and cooperative with normal psychomotor activity; exhibited "anxious, depressed and irritable mood" with an affect that was "increased in intensity, decreased in range, labile, mood-congruent, anxious and dysthymic"; had "linear and logical" thought process with "no psychotic content"; and exhibited "fair" insight and judgment with "grossly intact" cognitive function. R. 600. Dr. Rizvi restarted Abilify to "target[] major depressive symptoms as well as auditory hallucinations," continued Cymbalta, trazodone, and hydroxyzine (Atarax) for insomnia and anxiety, and instructed Stephanie to "resume psychotherapy with Dr. Caldwell because of ongoing stressors." R. 601–02. Stephanie "expressed understanding and agreement" with that plan.

In May, Stephanie saw Dr. Rizvi for anxiety and fatigue. R. 678. She reported "doing well overall," but she was stressed over physical health concerns, noting ongoing hip pain and erratic glucose levels "despite her best efforts." R. 679. She still found "Atarax helpful for anxiety and use[d] it before going out. She also use[d] trazodone at night with good effect. She reported "musical auditory hallucinations" that were "vague in description," "precipitated by stress," and "helped minimally by Abilify." *Id.* Stephanie did not want to change her psychiatric medications, however, because she felt "that [s]he should address her [physical] medical issues first." *Id.*; *see also* R. 682 ("After detailed discussion, we decided to continue current

9

medications as patient does not want to increase Cymbalta or discontinue Abilify at this time."). She also "still ha[d] not been able to get into psychotherapy because of insurance issues." R. 679. On exam, Stephanie was pleasant and cooperative with normal psychomotor behavior, exhibited an "anxious and depressed" mood with "normal, mood-congruent[,] and anxious" affect, had "linear and logical" thought process, and exhibited "fair" insight and judgment with "grossly intact" cognitive function. R. 680. Dr. Rizvi refilled Stephanie's trazodone, Abilify, and Cymbalta, and he encouraged her to pursue individual cognitive behavioral therapy ("CBT") to "process her ongoing medical difficulties that [were] relatively recent in onset," and to follow up with her primary care provider to get better diabetes control. R. 682.

Stephanie complained of depression, insomnia, worsening mood, and "multiple psychosocial stressors" when she saw Dr. Rizvi again in June. R. 700. She had not taken Cymbalta "in many weeks because she cannot afford it [at] '$118 per month,'" and "she was not able to do psychotherapy for the same reason." R. 701; *see* R. 704 ("Patient unable to engage in individual psychotherapy due to financial issues and lack of insurance."). Dr. Rizvi noted that Stephanie "wanted [him] to fill out the [disability] paperwork from her lawyer and became really irritable when [he] informed her that [they] usually do not fill paperwork from lawyers." R. 701. "She violently pulled out her medications from her bag" and told Dr. Rizvi, "'I just need my medications. I cannot deal with this [expletive], I cannot talk right now. Are we done[?]'" *Id.* When Dr. Rizvi "tried to explain and offer empathetic validation," Stephanie "calmed down briefly to entertain the possibility of [trying] alternative medications for sleep and mood[,] such as Elavil[,] but continued expressing [her] desire to end the interaction." *Id.* Stephanie said she "was not upset" about the disability paperwork, but instead was "generally frustrated with her mood, sleep and financial issues." *Id.* Stephanie "did not want to discontinue Abilify" even

though it was likely the reason "she ha[d] gained weight since [her] last visit." *Id.*; *see also* R.
704. She also endorsed continued "musical hallucinations," but said that she "finds them
'comforting.'" R. 701. On exam, Stephanie was pleasant and cooperative, but she exhibited
"psychomotor agitation," had an "angry, anxious, depressed and irritable" mood with an affect
that was "increased in intensity, labile, mood-congruent, inappropriate to items discussed and
anxious"; she exhibited "linear" thought process with "fair" judgment, but "limited" insight, and
had "grossly intact" cognitive function. R. 702. Dr. Rizvi discontinued Cymbalta secondary to
cost, added Elavil (amitriptyline) "as an alternative medication for anxiety[,] mood and
insomnia," continued Abilify at Stephanie's request, and refilled her trazadone and Atarax. *See*
R. 704.

Stephanie saw NP Brubaker again in August, stating that her chronic right shoulder pain
had returned after she stopped taking Cymbalta. R. 1131. On exam, Stephanie was "alert" with
"normal" mood, affect, and behavior, but she had some tenderness and decreased range of
motion ("ROM") in her right shoulder. R. 1134. NP Brubaker offered to prescribe gabapentin for
chronic pain, but she told Stephanie that she needed to consult with her psychiatrist to make sure
she could take it with her low-dose mood stabilizers. R. 1130–31 ("[S]he is seeing psychiatry
and that office stopped Cymbalta and started her on low-dose of 3 other medications to help
stabilize her mood. . . . She will call back and let me know if she is able to start [gabapentin]
with her other medication."). When Stephanie saw Dr. Rizvi in September, she told him that she
and her husband had recently separated, but that they still lived together because it was "not
possible for her to move to a new place." R. 897. Stephanie had "not been able to get Abilify for
3 days because her husband would not give her the money," and she "wonder[ed] if she can just
simply go off Abilify [because] she cannot afford the cost." *Id.* She also still had "not been able

to get into individual psychotherapy due to financial issues." *Id.* Stephanie felt like she was "'handling things well' in general" despite these stressors. *Id.* On exam, she was pleasant and cooperative "with good eye contact"; she described her mood as "'okay'" and her affect was "normal [in] range and responsiveness, mood-congruent, [and] appropriate to items discussed"; and she exhibited "linear and logical" thought process, "fair" insight and judgment, and "grossly intact" cognitive function. R. 898–99. "After [a] detailed discussion," Dr. Rizvi and Stephanie "decided to increase Elavil" to "target[] mood symptoms and insomnia," discontinue trazadone over concerns that "it may be redundant for insomnia," stop Abilify secondary to cost, continue hydroxyzine as needed for anxiety because it had "been useful" in treating those symptoms, and add gabapentin for chronic pain, which may also help with her anxiety enough to discontinue the hydroxyzine. R. 900. Dr. Rizvi also gave Stephanie information about online mental-health resources given that she was consistently "unable to afford psychotherapy due to lack of insurance." *Id.*

In November 2018, Stephanie told Dr. Rizvi she was doing "okay," but she did not like to leave the house and she had been "practically housebound for many weeks." R. 922. She still lived in a house with her estranged husband. Stephanie reported that Elavil had "been helpful for sleep [and] gabapentin for shoulder pain," but that hydroxyzine was "only partially effective for acute anxiety." *Id.* She still could not afford Cymbalta or individual psychotherapy. R. 925. On exam, Stephanie described her mood as "'depressed' and 'anxious,'" exhibited dysthymic mood and "circumstantial" thought process, denied auditory hallucinations, and had "fair" insight and judgment with "grossly intact" cognitive function. R. 924. Dr. Rizvi increased Elavil again to "target[] residual symptoms of anxiety and depression," added Ativan (lorazepam) "once daily as needed for panic attacks only," and continued hydroxyzine "as needed for anxiety" and

gabapentin for "neurogenic pain and anxiety." R. 925. He also noted that his clinic would "provide documentation needed for disability as required." *Id.*; *see, e.g.*, R. 776 (Oct. 2019 letter supporting Stephanie's claim for disability benefits).

In February 2019, Stephanie saw NP Brubaker for a follow up visit regarding her diabetes. R. 1240–41. She was "doing reasonably well" managing anxiety and depression under Dr. Rizvi's care. R. 1241. NP Brubaker noted that Stephanie's "mood appear[ed] bright" that day and that she "was using eye contact freely" during their visit. *Id.* On exam, Stephanie was "alert" and in "no acute distress," and had "normal" mood, affect, behavior, thought process, and memory. R. 1245. Later in February, Stephanie attended a nutrition appointment where she was instructed on how to properly manage her diabetes. R. 1301–05. Dietitian Mary Albert, M.S., R.D., showed Stephanie how to use a glucose meter, lancing device, and logbook, and Stephanie "performed a return demo without difficulty" and was "able to teach back use of meter and lancing device." R. 1305.

Stephanie saw Dr. Rizvi again in March for depression and fatigue. R. 946. She said she had gotten insurance at the start of the year and had been taking her medications recently, but she reported feeling "quite depressed" during that time because of poor diabetes control and familial stressors. R. 947. She also reported "poor motivation and anhedonia as well as anergia . . . and note[d] that she takes 1-2 naps during the day." *Id.* She used lorazepam "occasionally for acute anxiety and found it helpful although[,] at this time, she consider[ed] depression to be her major problem." *Id.* She also took trazodone "intermittently" as needed for insomnia and used Ativan (lorazepam) as needed for panic attacks. R. 952. On exam, Stephanie described her mood as "'depressed' and 'anxious,'" and her affect was "dysthymic, anxious, labile, and tearful, mood-congruent and appropriate to [the] items discussed." R. 949. Otherwise, she continued to present

13

as "pleasant" and "cooperative" with "normal" psychomotor behavior and speech, "linear, logical, [and] goal directed" thought process, "fair" insight and judgment, and "grossly intact" cognitive function. *Id.* After a detailed discussion about treatment, Dr. Rizvi added Wellbutrin (bupropion) to "target depression and anergia" and continued Ativan for acute panic attacks, Elavil (amitriptyline) for "anxiety, insomnia and depression," and gabapentin for anxiety. R. 952. He also encouraged Stephanie to seek individual psychotherapy now that she had insurance, and Stephanie "expressed motivation to do so." *Id.* In May, Stephanie told Dr. Rizvi that Wellbutrin "helped her with motivation and energy and she [was] able to get more things done in the house. However, she continue[d] to have some anxiety and [did] not want to get out of the house." R. 1002. She was "using more Ativan recently because it [was] more effective than hydroxyzine" in managing acute anxiety events. *Id.* Stephanie "underst[ood] that she should limit Ativan as much as possible," however. *Id.* She had not started individual psychotherapy yet, but she was still "motivated to do so." *Id.* "Overall, she [felt] that she [was] making progress and [had a] 'positive outlook.'" *Id.* Stephanie also said that she "developed occasional eye twitches in the last few weeks and had some numbness and twitching of her fingers," and she wondered if those new symptoms were "related to [her] psychiatric medications." *Id.* Dr. Rizvi noted that Stephanie was "not on any antipsychotics and [did] not appear to have any repetitive or recurrent involuntary movements" on exam that day. *Id.* The rest of her exam was normal except for "anxious" mood and affect. R. 1004–05 (pleasant, cooperative, normal behavior; normal speech; linear, logical, goal directed thought process; grossly intact cognition; age appropriate and fair insight and judgment). Dr. Rizvi continued Stephanie's psychiatric medications (amitriptyline, Wellbutrin, gabapentin, hydroxyzine, lorazepam) and referred her to individual psychotherapy at Valley Behavioral Health ("VBH"). *See* R. 1006. He also gave Stephanie "literature about mindfulness

and recommended online resources for meditation skills." *Id.* In June, Stephanie saw NP Brubaker for a follow up visit regarding her diabetes. R. 1518. On exam, she was alert and in no acute distress, and she displayed normal mood, affect, behavior, thought content, and memory. R. 1523. In July, Stephanie told NP Brubaker that she was walking a few times a week for exercise and "not taking as much anxiety" medications because "her walking seem[ed] to be helping with" those symptoms even though she had "high stress at home." R. 1622.

Stephanie visited with Dr. Rizvi again in October, reporting "that she [was] generally stable although she [was] quite stressed by her multiple psychosocial stressors." R. 1060. She was hesitant to specify what these stressors were, but later revealed several issues she was having with different family members. *Id.* Stephanie said her "psychiatric medications [were] helpful but 'they did not prevent [her] from having [a] bad day.'" *Id.* She took hydroxyzine for anxiety at home and Ativan "only when she is getting outside the home." *Id.* She did not want to change any of her medications that day. *Id.* On exam, Stephanie described her mood as "'okay,'" and presented with "dysthymic" affect. R. 1062. The rest of her exam was unremarkable, including normal psychomotor activity, "linear, logical, goal directed" thought process, and "grossly intact" cognitive function. R. 1062–63. Dr. Rizvi refilled Stephanie's medications and assessed recurrent major depressive disorder, in partial remission; generalized anxiety disorder; alcohol abuse, in remission; mixed obsessional thoughts and acts; insomnia; and panic attacks. R. 1066. These conditions were "[a]ll stable." *Id.*

    2.    *Relevant Opinion Evidence*

DDS reviewer Linda Dougherty, Ph.D., evaluated Stephanie's mental impairments in May 2018. *See* R. 71–78. She opined that Stephanie's "severe" depressive disorder and anxiety disorder, R. 71, caused a "mild" limitation in her overall ability to understand, remember, or

apply information, but they did not impact her abilities to perform specific "understanding and memory" activities in the workplace, R. 76. Stephanie's severe depressive disorder and anxiety disorder also caused "moderate" limitations in her overall abilities to interact with others, to concentrate, persist, or maintain pace, and to adapt or manage herself. R. 72. More specifically, her psychological symptoms and "intermittent auditory hallucinations" would "moderately" limit her ability to "complete a normal workday and workweek without interruptions . . . and to perform at a consistent pace without" taking "unreasonable" rest breaks. R. 77. Dr. Dougherty opined that Stephanie still "would be able to maintain concentration and attention for two hours to complete an 8 hour work week" and "perform at a generally consistent pace w[ith] others w[ith] only minimal need for accommodations on an infrequent basis" notwithstanding her psychological symptoms. *Id.* Stephanie also "would be able to interact w[ith] supervisors and coworkers in order to complete required duties" because her symptoms did "[n]ot significantly limit[]" her capacities in those work-related areas, "but [she] would be less comfortable in situations requiring frequent social contact w[ith] the public." *Id.* (finding "moderately limited" ability to "interact appropriately with the general public"). Because of her symptoms, Stephanie "would be able to interact w[ith] the public only for brief period[s]" and "would need assistance in adapting to change unless implemented infrequently." R. 77–78.

In August 2018, DDS reviewer Joseph Leizer, Ph.D., evaluated Stephanie's mental impairments based on her updated medical records. *See* R. 90–91, 94–96. He agreed with Dr. Dougherty that Stephanie's "severe" depressive disorder and anxiety disorder caused a "mild" limitation in her overall ability to understand, remember, and apply information, and "moderate" limitations in her overall abilities to interact with others, to concentrate, persist, or maintain pace, and to adapt or manage herself. R. 90 (noting that Dr. Dougherty "provided a comprehensive

16

evaluation that was reflective of [Stephanie's] psychological functioning" in May 2018, and that information received since that time "continue[d] to support the initial finding of [Stephanie] being capable of simple, unskilled work"). More specifically, Dr. Leizer opined that Stephanie could "understand and remember short and simple job instructions, locations[,] and procedures," R. 95; could "pay attention for 2-hour periods in order to complete an 8-hour workday" and had "minimal need for accommodations," but would "work best with [only] occasional interaction with coworkers and supervisors," R. 95–96; would "require all work place[] changes to be implemented gradually," R. 96; and would "work best with [only] occasional interaction with customers and the general public" and "few coworkers in a well-spaced environment," R. 96.

In October 2019, Dr. Rizvi wrote a "To Whom It May Concern" letter supporting Stephanie's disability claim. R. 776. He noted that "she had been diagnosed with recurrent major depressive disorder, generalized anxiety disorder, obsessive-compulsive disorder, panic attacks, insomnia and psychological distress," and explained that, "[d]ue to significant psychiatric comorbidity, she [was] currently taking multiple psychiatric medications including bupropion, gabapentin, hydroxyzine, lorazepam, and amitriptyline." *Id.* Following their "recent follow-up visits, it [was his] assessment that [Stephanie's] significant psychiatric symptoms interfere with her ability to engage fully in gainful employment." *Id.* "Another factor may be possible difficulty with operating a vehicle safely given the sedating medications [Stephanie was] taking for severe symptoms." *Id.* Finally, Dr. Rizvi opined that although "many of [her] psychiatric conditions are episodic and may improve over time," Stephanie's prognosis was "somewhat guarded at [that] time given [her] partial response to multiple treatment interventions." *Id.* "Therefore, [Dr. Rizvi] wholeheartedly support[ed] her claim for social security disability benefits." *Id.*

3.     *Stephanie's Relevant Testimony*

In May 2018, Stephanie reported to DDS that she usually got up around noon, spent the day sitting on the couch watching television or looking out the window, and then went to bed around 10:00 p.m. R. 242. She left the house only when necessary and reported that she was "not allowed to drive on [her] medications." R. 245. Amitriptyline (Elavil) and hydroxyzine (Atarax) caused "drowsiness." R. 285. In July 2018, Stephanie clarified that she did not drive because, "my meds say[] I can't operate machinery." R. 297. She had started taking trazadone to help her sleep, which also caused "drowsiness." R. 315. Stephanie said that her only hobby was sleeping, and she slept "all the time." R. 298. Her impairments affected her ability to complete tasks, concentrate, and get along with other people, but not her ability to remember things. R. 247, 299. She could not pay attention for "long" because her "mind doesn't stop spinning." R. 247; *see* R. 299 ("For how long can you pay attention? About 5 minutes."). She did not handle stress well and had to take anxiety medicine. R. 248; *see also* R. 300 ("I panic at any stress or pressure.").

In December 2019, Stephanie testified that she took fifteen medications, R. 48, and "[s]ome of them make [her] tired," R. 50. Wellbutrin "doesn't work at all" to improve her mood, R. 49, and it made her "feel drained" when combined with gabapentin, R. 52. Hydroxyzine and lorazepam (Ativan) "helped" her anxiety and panic attacks to some extent. R. 50. She took trazadone every night to help her sleep, which worked better than Seroquel. R. 50–51. Stephanie testified that she was "not allowed to drive" and she "can't do anything" while taking these medications. R. 54. She took two or three naps during the day, R. 52–53, and rarely left her house, R. 46. Stephanie also gave ALJ Simmonds a fifty-page printout from Drugs.com listing every side-effect known to be associated with each of her prescribed medications. *See* R. 20 (citing R. 342–91). Gabapentin and lorazepam (Ativan) are both "commonly reported" to cause

18

drowsiness, fatigue, or sedated state. R. 356, 374. Those side-effects typically are not associated with amitriptyline (Elavil), bupropion (Wellbutrin), or hydroxyzine (Atarax). R. 347–55, 366–67.

B.   *The ALJ's Decision*

ALJ Simmonds discussed this evidence throughout her written decision. *See* R. 16–22. At step two, she found that Stephanie's major depressive disorder, generalized anxiety disorder, and alcohol-use disorder were "severe" MDIs because they "significantly limit [her] ability to perform basic work activities," R. 14, which, according to the regulations, include mental functions like following "simple instructions," exercising judgment, responding appropriately to supervision, coworkers, and usual work situations, and dealing with changes in a routine work setting, 20 C.F.R. § 404.1522(b)(3)–(6). At step three, ALJ Simmonds explained that those severe mental MDIs were not presumptively disabling because they caused "mild" limitation in Stephanie's overall ability to adapt and manage herself and "moderate" limitations in her overall abilities to understand, remember, or apply information, to interact with others, and to concentrate, persist, and maintain pace. R. 16–17. For example, Dr. Rizvi's and other providers' "treatment records from 2018 and 2019 consistently document normal thought content and normal memory," "pleasant and cooperative behavior," "linear and logical thought process . . . and grossly intact cognition." R. 16 (citing R. 600, 680, 898–99, 949, 1004, 1062, 1134, 1245, 1523, 1752). Stephanie also shopped for groceries on a weekly basis, occasionally went out to eat, routinely cooked healthy meals for her family, socialized with friends and family, did some household chores, and independently traveled out of state to care for her elderly grandmother during the relevant time. *See* R. 16–17 (citing R. 599, 1060, 1305, 1450–01, 1453, 1622–23, 1626–27).

Next, ALJ Simmonds found that Stephanie retained the capacities to do a reduced range of "light" exertional work, "perform simple routine tasks in a nonpublic setting that [required] only occasional interaction with co-workers and frequent interaction with supervisors," "maintain concentration, persistence, and pace in 2-hour increments[] and perform work that does not require a production rate pace or an hourly quota," and "remain on task 90 percent (or be off task for no more than 10 percent) of the workday." R. 17; *see* R. 19, 22. As part of her RFC assessment, ALJ Simmonds evaluated Stephanie's allegations "that prescription medication provide[d] little or no relief [for] her symptoms and cause[d] side effects of . . . tiredness, and perceptual distortion," as well as her testimony that she cannot do "any work because she must lie down rest/nap twice per day due to depression, anxiety, panic attacks, and/or medication side effects." R. 18; *see also* R. 18–19 ("The claimant also argues that the combination of her musculoskeletal symptoms, psychological symptoms, and medi[c]ation side effects cause a disabling degree of limitation in the ability to remain on task during the workday."). ALJ Simmonds found that those allegations were "inconsistent with the objective medical evidence and other evidence in the record," *see* R. 19, which, considered as a whole, established that Stephanie could do "a reduced range of light work that involves simple routine tasks performed in a nonpublic setting with occasional interaction with coworkers and frequent interaction with supervisors and no production rate pace or . . . hourly quota requirements," *id. See* R. 22 ("The [RFC] assessment also contains appropriate mental limitations to account for the claimant's subjective psychological symptoms and potential medication side effects.").

More specifically, she found that Stephanie's treatment records "reveal[ed] that prescription medication successfully controls [her] pain, mood, behavior, sleep, thought content, anxiety, and panic attacks when taken as prescribed," and that "[t]he only evidence [Stephanie]

provide[d] in support of her alleged medication side effects [was] a printout . . . from the website Drugs.com that lists every known side effect associated with [those] medication[s] and a letter from her psychiatrist indicating that sedation is a possible side effect of the claimant's medication." R. 19–20 (citing R. 342–91, 776). ALJ Simmonds concluded that although this evidence "support[ed] the existence of *potential* medication side effects," R. 20 (emphasis added), Stephanie's *actual* "medical records [did] not document any complaints or abnormal examination findings of . . . fatigue[] or perceptual distortion since March 2019—the last time [her] medication regime was adjusted," *id.* (citing R. 951–52, 1060–63, 1066, 1348, 1453, 1519–20, 1523–24). On the contrary, NP Brubaker noted that Stephanie was "alert" with "normal behavior, normal memory, and normal thought content in August 2018, February 2019, and June 2019," and Dr. Rizvi's treatment notes from 2018 and 2019 "consistently document" her "normal psychomotor activity, normal thought content, intact sensorium, grossly intact cognition, and appropriate to fair insight and judgment." *Id.* (citations omitted); *see also* R. 16–17. Moreover, Stephanie's testimony describing extremely limited, or even non-existent, daily activities conflicted with specific statements she made to her healthcare providers when describing her functional abilities and activities. *See* R. 20 (citations omitted). ALJ Simmonds credited the latter category of statements in concluding that Stephanie "engage[d] in a level of daily activity and interaction that [was] inconsistent with disability." *Id.*

　　　Turning to the opinion evidence, the ALJ noted that Dr. Rizvi "submitted a letter, dated October 2019, stating that [Stephanie] may have possible difficulty operating a vehicle safely due to sedating medications." R. 21. ALJ Simmonds found this opinion was "not persuasive" for two reasons. *Id.* First, it was "not supported by" Dr. Rizvi's own treatment notes documenting "intact orientation, logical and goal-directed though processes, normal thought content, and

intact cognition in March 2019, May 2019, and October 2019." *Id*. Second, ALJ Simmonds found that the opinion was "inconsistent with [Stephanie's] ability to quickly learn how to use a glucose machine/meter quickly [sic] without difficulty in February 2019 and cook meals on a daily basis." *Id.* (citing R. 1305, 1451, 1623).

ALJ Simmonds then summarized Dr. Dougherty's and Dr. Leizer's RFC assessments and found that their opinions about Stephanie's specific work-related mental abilities and limitations were "partially persuasive." R. 22 (citing R.76–78, 94–96). She first explained that they were "supported by treatment records at the initial and reconsideration levels that reflect a history of ongoing medication adjustment in 2018 to address lingering symptoms of depression, anxiety, mood swings, irritability, sleep disturbance, and auditory hallucinations." *Id.* Treatment records produced at the hearing level, however, showed that Stephanie's "psychological symptoms stabilized following a final medication adjustment in March 2019." *Id.* Nonetheless, the ALJ found Stephanie's hearing testimony established a "greater degree of limitation in the ability to maintain concentration" than Dr. Dougherty and Dr. Leizer had indicated, *id.*, and she therefore restricted Stephanie to work that both allowed her to "be off task for no more than 10 percent[] of the workday" and did "not require a production rate pace or an hourly quota," R. 17. *See* R. 22, 76–77, 95–96. Further, she found, contrary to Dr. Leizer's opinion, that Stephanie was "capable of frequent interaction with supervisors based on [her] ability to interact with and accept instruction from her dietician in 2019." R. 22; *see* R. 17, 95–96. That finding is consistent with Dr. Dougherty's initial opinion that Stephanie would "be able to interact with supervisors . . . to complete required duties" and was "not significantly limited" her ability to "accept instructions and respond appropriately to criticism from supervisors." R. 77.

Based on her RFC finding and the VE's hearing testimony, ALJ Simmonds concluded that Stephanie could perform certain "light" unskilled jobs existing in significant numbers in the national economy, R. 23, and thus she found that Stephanie was "not disabled" from August 1, 2017, through January 24, 2020, R. 24.

C.      Analysis

Stephanie's arguments challenge the ALJ's RFC assessment. RFC is the claimant's "maximum remaining ability to do sustained work activities in an ordinary work setting" for eight hours a day, five days a week despite his or her medical impairments and related symptoms. SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996) (emphasis omitted). It is a factual finding "made by the [ALJ] based on all the relevant evidence in the case record," *Felton-Miller v. Astrue*, 459 F. App'x 226, 230–31 (4th Cir. 2011), and it should reflect specific, credibly established "restrictions caused by medical impairments and their related symptoms" that affect the claimant's "capacity to do work-related physical and mental activities," SSR 96-8p, 1996 WL 374184, at *1, *2. *See Mascio v. Colvin*, 780 F.3d 632, 637–40 (4th Cir. 2015); *Reece v. Colvin*, 7:14cv428, 2016 WL 658999, at *6–7 (W.D. Va. Jan. 25, 2016), *adopted by* 2016 WL 649889 (W.D. Va. Feb. 17, 2016). Generally, a reviewing court will affirm the ALJ's RFC findings when the ALJ considered all the relevant evidence under the correct legal standards, *see Brown v. Comm'r of Soc. Sec. Admin.*, 873 F.3d 251, 268–72 (4th Cir. 2017), and built an "accurate and logical bridge from that evidence to his [or her] conclusion[s]," *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018). ALJ Simmonds's RFC assessment satisfies this deferential standard of review.

1.      Dr. Rizvi's Opinion

23

Stephanie first asserts that the ALJ did not give "considerable weight" to Dr. Rizvi's opinion that Stephanie's psychiatric comorbidities and "significant psychiatric symptoms would . . . interfere with [her] being gainfully employed," Pl.'s Br. 2 (citing R. 776), as well as his purported conclusion that, "due to the sedating effects" of her medications, Stephanie "*would not* be able to operate a vehicle safely to drive to her place of employment or drive home from that employment," *id.* (emphasis added). *Contra* R. 776 ("Another factor *may be possible* difficulty with operating a vehicle safely given the sedating medications she has been taking for severe symptoms." (emphasis added)). Stephanie notes that Dr. Rizvi treated her for five years and that she "was not evaluated by a psychiatrist for the Social Security Administration prior to the hearing." Pl.'s Br. 2. Stephanie's argument does not identify any specific error in the ALJ's analysis of Dr. Rizvi's opinion. Instead, she provides her own interpretation of Dr. Rizvi's letter and points out, correctly, that ALJ Simmonds "failed to give considerable weight" to his opinions when evaluating Stephanie's RFC. *Id.*; *see* R. 22 ("This opinion is not persuasive.").

For claims filed after March 27, 2017, like Stephanie's claim, the ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources." 20 C.F.R. § 404.1520c(a). Instead, the ALJ must adequately explain whether and to what extent every medical opinion in the record is "persuasive." *See id.* § 404.1520c(b). The regulations instruct that supportability and consistency are "the most important factors" and therefore the ALJ must articulate how he or she considered those two factors in evaluating the persuasiveness of any medical opinion or a finding. *See id.* § 404.1520c(b)(2), (c)(1)–(2). The ALJ may, but is generally not required to, explain how he or she considered other factors, including the medical source's specialization and relationship with the claimant. *Id.* § 404.1520c(c)(3)–(5).

ALJ Simmonds's explanation complied with this regulation. First, the only language in Dr. Rizvi's letter that arguably qualified as a "medical opinion," *id.* § 404.1513(a)(1)(3)(i), was his statement that Stephanie "may [have] possible difficulty with operating a vehicle safely given the sedating medications she has been taking for severe statements," R. 776. His opinion that Stephanie's "significant psychiatric symptoms interfere with her ability to engage fully in gainful employment," R. 776, was a statement on an issue reserved the Commissioner, 20 C.F.R. § 404.1520b(c)(3)(i), and therefore was "inherently neither valuable nor persuasive" when determining disability, *id.* § 404.1520b(c). Indeed, the regulations dictate that ALJs "will not provide any analysis about how [they] considered such evidence" in their written decisions. *Id.* § 404.1520b(c). *See, e.g.*, *Richard P. v. Saul*, No. 5:20cv22, 2021 WL 2152566, at *7 (W.D. Va. May 27, 2021); *cf. Reid v. Comm'r of Soc. Sec.*, 769 F.3d 861, 865 (4th Cir. 2014) (explaining that "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision" as long as "the whole record was considered" and the ALJ's findings are supported by substantial evidence). His remaining statements about Stephanie's psychiatric diagnoses, her "partial response" to prescribed treatment, and her "somewhat guarded" prognosis, R. 776, were "[o]ther medical evidence," 20 C.F.R. § 404.1513(a)(3), that ALJ Simmonds was not required to evaluate under § 404.1520c. *See generally Castro v. Saul*, No. 7:20cv35, 2021 WL 4190640, at *7–8 (E.D.N.C. Aug. 31, 2021), *adopted sub nom. Castro v. Kijakazi*, 2021 WL 4189618 (E.D.N.C. Sept. 14, 2021).

Second, ALJ Simmonds concluded Dr. Rizvi's opinion that Stephanie "may have possible difficultly operating a difficulty due to sedating medications" was "not persuasive," R. 21 (citing R. 776), and she cited specific, relevant evidence in explaining why that opinion was both "inconsistent with" and "not supported by" the record, including the psychiatrist's own

findings on mental status exams, *id.* (citing R. 949, 1004, 1062, 1305, 1451, 1623). Stephanie does not challenge those findings or rationale, Pl.'s Br. 2, which are amply supported by the record. Accordingly, I find no error in ALJ Simmonds's finding that Dr. Rizvi's medical opinion was not persuasive. *See Holland v. Kijakazi*, No. 1:20cv249, 2021 WL 3744563, at *3 (W.D.N.C. Aug. 24, 2021) ("Determinations as to the persuasiveness of . . . medical opinions will not be disturbed absent some indication of specious inconsistencies or lack of proper justification." (citing *Koonce v. Apfel*, 166 F.3d 1209, at *2 (4th Cir. 1999) (table))).

       2.    *Consideration of Sentara SMH Behavioral Health Records*

      Stephanie next argues that the ALJ failed to give "considerable weight to the medical records from Sentara RMH Behavioral Health," Pl.'s Br. 2 (citing R. 670–718, 851–1096), which include Dr. Rizvi's exam findings and treatment notes from May 2018 to October 2019, *see, e.g.*, R. 680, 702, 898–99, 924, 949, 1002, 1004–06, 1059–63, 1066. She asserts that these medical records "substantiate" Dr. Rizvi's medical opinion because they "show [her] continuous anxious mood, depressive state, continued issues of insomnia and fatigue along with adjustments to her medications." Pl.'s Br. 2. Again, Stephanie does not explain why she believes that ALJ Simmonds committed reversible error by not giving "considerable weight" to those records, or how the ALJ giving "considerable weight" to that evidence would have changed the outcome of Stephanie's disability claim. *See id.*; *Reid*, 769 F.3d at 865. To the extent she suggests that ALJ Simmonds ignored or rejected Dr. Rizvi's treatment records when evaluating his October 2019 opinion letter, the record belies her argument. Indeed, ALJ Simmonds found Dr. Rizvi's opinion "not persuasive" in part *because* it was "not supported by" his own treatment records "document[ing] intact orientation, logical and goal-directed thought processes, normal thought content, and intact cognition" in 2018–2019. R. 21. ALJ Simmonds also explained that she found

Stephanie's allegations that "prescription medication provide[d] little to no relief [for] her symptoms" and caused "side effects . . . of tiredness[] and perceptual distortion," R. 19, were inconsistent with Dr. Rizvi's treatment notes because those records showed that medications did help Stephanie's anxiety and depression to some extent and they did "not document any complaints or abnormal examination findings of . . . fatigue[] or perceptual distortion," R. 19–20. Stephanie does not identify any error in ALJ Simmonds's evaluation of this evidence or "point to any specific piece of evidence not considered by the [ALJ] that might have changed the outcome of [her] disability claim." *Reid*, 769 F.3d at 865 (emphasis omitted).

      3.     *Consideration of Medication Side Effects*

      Stephanie also contends that ALJ Simmonds "should have given greater consideration to the side effects" Stephanie experiences from her medications. Pl.'s Br. 2–3. Specifically, she argues that her medications affect her ability to stay awake, which supports Dr. Rizvi's opinion. *Id.* Stephanie testified to various side effects she experiences from her medications, including that "some of them make [her] tired." R. 50. ALJ Simmonds discussed this testimony in her RFC assessment, and she provided specific, legitimate reasons for finding Stephanie's "potential medication side effects," R. 22, including fatigue or drowsiness, were not disabling. *See* R. 16–17, 19–20, 22. For example, she found that, although Stephanie produced evidence to "support the existence of *potential* medication side effects," Stephanie's *actual* "medical records [did] not document any complaints or abnormal examination findings of . . . fatigue[] or perceptual distortion since March 2019—the last time that [her] medication regime was adjusted." R. 20 (emphasis added). That is a legitimate reason to discount Stephanie's allegations describing disabling fatigue, *see Johnson*, 434 F.3d at 658 ("Drowsiness often accompanies the taking of medication, and it should not be viewed as disabling unless the record references serious

functional limitations."); *Green v. Astrue*, No. 3:10cv764, 2011 WL 5593148, at *8 (E.D. Va.

Oct. 11, 2011) ("Simply because certain medications have 'known' side effects does not

necessarily mean that such effects are experienced by anyone who takes the medication."), and it

is amply supported by the record, *see, e.g.*, R. 600, 680, 898–99, 949, 1004, 1062, 1134, 1245,

1523, 1752. Again, Stephanie asserts only that ALJ Simmonds "should have given greater

consideration" to her alleged medication side effects, without offering any reason why the ALJ's

consideration of that evidence was deficient. Pl.'s Br. 2.

       *4.*    *Reliance on Findings of PCP*

       Lastly, Stephanie argues that it was error for the ALJ to reference certain exam findings

made by her primary care provider, NP Brubaker, including findings of "no acute distress" and

"normal" memory, because a primary care provider "is not qualified to assess" Stephanie's

"mental issues." Pl.'s Br. 3. This argument is without merit. Stephanie cites to no authority to

support her position, *see id.*, which is at odds with the ALJ's obligation to consider all relevant

evidence in the record, 20 C.F.R. § 404.1520(a)(3) ("We will consider all evidence in your case

record when we make a determination or decision whether you are disabled."); *Patterson v.

Comm'r of Soc. Sec.*, 846 F.3d 656, 659 (4th Cir. 2017) ("In determining the most a claimant can

still perform, the decision maker must evaluate 'all' relevant record evidence."). NP Brubaker's

normal findings on mental-status exams were relevant to Stephanie's mental impairments

generally, as well as to her allegations that "depression, anxiety, panic attacks, and/or medication

side effects. . . . cause a disabling degree of limitation in [her] ability to remain on task during

the workday." R. 18–19. Accordingly, I find no error in the ALJ's partial reliance on NP

Brubaker's exam findings in his assessment of Stephanie's RFC.

       *5.*    *Off-Task Limitation*

At oral argument, Stephanie's counsel argued for the first time that the ALJ erred in finding that she only would be off task for no more than ten percent of the workday. *See* R. 17. According to Stephanie, no medical provider opined that she maintained sufficient concentration to stay on task for the remaining ninety percent of the workday. While that is accurate, it is equally true that no medical provider opined Stephanie *could not* stay on task for at least ninety percent of the workday. Indeed, as the ALJ acknowledged, both DDS reviewers to assess Stephanie's mental RFC opined that she could maintain concentration for two-hour periods, and both found she could complete a normal workday with only minimal accommodations. R. 77, 95. ALJ Simmonds included an off-task limitation in the RFC finding because Stephanie's hearing testimony from late 2019 established "a greater degree of limitation in the ability to maintain concentration" than the DDS reviewers had identified in mid-2018. R. 22; *see* R. 17, 18–22. As such, I find no error in the ALJ's determination that Stephanie could "remain on task 90 percent (or be off task for no more than 10 percent) of the workday," R. 17. *See, e.g.*, *Sedale Y. v. Kijikazi*, No. 7:20cv709, 2022 WL 337188, at *2 (W.D. Va. Feb. 4, 2022) ("To the extent the ALJ somehow erred in not explaining in greater detail his conclusion that the plaintiff would . . . be off-task five to ten percent of the workday, any such error is harmless. These restrictions are greater than those stated by any medical source in the record and are a reflection of the plaintiff's testimony regarding his limitations.").

In sum, Stephanie fails to identify a reversible error by the ALJ. Accordingly, I find that the decision must be affirmed.

## IV. Conclusion

For the foregoing reasons, the Court will **DENY** Stephanie's Motion for Summary Judgment, ECF No. 16, **GRANT** the Commissioner's Motion for Summary Judgment, ECF No.

17, **AFFIRM** the Commissioner's final decision, and **DISMISS** this case from the Court's active docket.

A separate Order shall enter.

ENTER: March 28, 2022

Joel C. Hoppe
United States Magistrate Judge